Scott *v.* Detroit Young Men's Society's Lessee.

JOHN SCOTT AND CARL BOLAND *v.* THE DETROIT YOUNG
MEN'S SOCIETY'S LESSEE.

Douglass.
1 d 119
86    5
1 d 119
f 118  565.
Douglass
1 d   119
D5How   343
D12 (US)  181
Led
Douglas
1 d 119
154  13556

The Territory of Michigan, as established by the act of Congress of January 11,
1805, did not remain subject to the territorial government, until the admission of
the State of Michigan into the Union by Congress, January 26, 1837 ; but the State
came into existence, and possessed the power of independent state legislation, on
the adoption and ratification, by the people of the territory, of the constitution of
the state, and the organization of the state government.

The " Act to incorporate the Detroit Young Men's Society," passed by the legislature,
and approved by the Governor of the state, March 26, 1836, was not invalid on
the ground that the state government had no legal existence until after the admis-
sion of Michigan into the Union, January 26, 1837.

Article V. of the articles of compact contained in the " Ordinance of 1787, for the
government of the Territory of the United States north-west of the river Ohio,"
secured, absolutely and inviolably, to the people of the territory of Michigan as
established by the act of Congress of January 11, 1805, the right to form a per-
manent constitution and state government, whenever said territory should contain
sixty thousand free inhabitants ; and that right could in no way be modified or
abridged, or its exercise controlled or restrained, by the general government.  The

formation of the constitution and government of the state of Michigan, must, of necessity, have preceded her admission into the Union by Congress.

The assent of Congress to the admission of Michigan into the Union was only necessary, because the older states represented in Congress, possessed the physical power to refuse a compliance with the terms of compact contained in the Ordinance of 1787, and there was no third party to which the state could resort to enforce such compliance ; but the right to such admission, secured by Article V. of the Ordinance, became absolute and unqualified, on the adoption of the constitution of the state, and the organization of the state government.

Notwithstanding the previous organization of the state government, the Governor and Judges of the territory of Michigan, holding their offices and appointment under the authority of the United States, remained in office, and competent to execute the powers conferred upon them by the act of Congress entitled " An act to provide for the adjustment of titles of land in the town of Detroit, and territory of Michigan, and for other purposes," approved April 21, 1806, until after the 1st day of July, 1836.

They continued in office, and in the full and undiminished exercise of their powers as Governor and Judges, over the country lying west of Lake Michigan, which formed a part of the territory of Michigan, at the time of the organization of our state government, until after the 3d day of July, 1836, when the territory of Wisconsin was organized.

The jurisdiction and powers of the Judges of the territory of Michigan, as a District and Circuit Court of the United States, conferred by acts of Congress of March 3, 1805, (Story's Laws U. S. 975,) and February 19, 1831, (Gord. Dig. § 520,) remained unaffected by the organization of the state government, and were retained by them, until their offices were abolished by express legislation of Congress, to take effect on the admission of Michigan into the Union.

The organization of our state government in its various departments, was gradual and progressive ; and that no inconvenience might arise therefrom, it was provided by sec. 5, of the Schedule annexed to the constitution of the state, that all officers, civil and military, then holding their offices and appointments in the territory, under the authority of the United States, or under the authority of the territory, should continue to hold and exercise their respective offices and appointments, until superseded under the constitution. As the Judges of the Supreme Court of the state did not enter upon their official duties, and the law under which they were appointed did not take effect until after July 4, 1836, it might be plausibly contended, that the Judges of the territory remained in office, and that their offices were not superseded until that time.

Congress having authorized the Governor and Judges of the territory of Michigan for the time being, to convey certain lands, the fee of which was in the United States, and having, by acts of legislation, recognized the persons who assumed to

Scott *v.* Detroit Young Men's Society's Lessee.

convey such lands, by virtue of such authority, as incumbents of those offices, and the existence of those offices, at, and subsequent to, the time when such conveyance was made, a mere stranger will not be permitted to controvert the title acquired by such conveyance, on the ground that the grantors were not, at the time of the grant, such Governor and Judges, and that there were no such offices.

If the principal recognize and affirm the existence and acts of an agent, a mere stranger will not be permitted to controvert either.

Where several persons are empowered by law to execute a public trust or power, and, in the execution thereof, all are present to deliberate, the act of a majority will be valid.

They will all be presumed to have been present, and to have deliberated upon the act, unless the contrary expressly appears.

The land board constituted by the act of Congress entitled " An act to provide for the adjustment of titles of land in the town of Detroit, and territory of Michigan, and for other purposes," approved April 21, 1806, did not consist of two integral parts, the Governor, and the Judges of the territory of Michigan ; but of four persons, designated by their names of office, any three of whom were authorized to execute any of the powers conferred by the act ; and a deed of bargain and sale, executed by the Judges only, is valid.

Parol evidence is admissible, to prove official character.

A Treasurer's deed executed October 10, 1833, in consummation of a sale of land for the taxes of 1828, is, at best, evidence of the regularity of the Treasurer's *sale* only; and is not admissible in evidence to prove title, unless accompanied by proof, that the taxes had been legally assessed and returned, and that all the proceedings anterior to the sale had been in conformity to the statute.*

*Held,* that certain parol proof, and also a resolution of the Governor and Judges of the Territory of Michigan, offered in evidence for the purpose of showing an assignment by them prior to 1828 of certain premises, were irrelevant and inadmissible.

ERROR to Wayne Circuit Court.    Ejectment, brought by the defendants in error, to recover possession of lot 56,

---

* The law under which the taxes in this case were assessed and returned and the deed given, was enacted April 13, 1827, (Laws 1827, p. 378,) and continued in force (Laws 1833, p. 96, § 15,) until the Revised Statutes of 1838, took effect.    It was, in part, as follows : "Which conveyance," (the deed of the County Treasurer,) " shall vest in the person or persons to whom it shall be given, an absolute estate in fee simple, subject to all the claims which the Territory of Michigan shall have thereon, and the said conveyance, shall be conclusive evidence, that the *sale* was regular, according to the provisions of this act."    By the R. S. of 1838, the sale of land for taxes was required to be made, and the deed given, by the Auditor General, and it was provided that his deed should " be conclusive evidence of title : Provided such assessment and

section 1, in the city of Detroit. Plea, not guilty. The cause was tried at the November term, 1839, before Hon. GEO. MORELL, Presiding Judge.

On the trial, the defendants in error, to prove their corporate existence, their right to take and hold real estate, and to sue for its recovery, offered in evidence what purported to be an act of the Legislature of the State of Michigan, entitled " An act to incorporate the members of the Detroit Young Men's Society," approved March 26, 1836, by Stevens T. Mason, as Governor of the state. The plaintiffs in error objected to its introduction, on the ground that the government of the *State* of Michigan, was not established, and neither the Legislative, nor Executive departments of such a government, had any legal existence on the 26th day of March, 1836, and prior to the admission of the state into the Union by Congress, January 26, 1837. The Court overruled the objection, and permitted the act to be read to the jury.

They also proved user of their corporate rights, under the act above mentioned.

They offered in evidence, what purported to be a deed of the lot described in the declaration, from the Governor and Judges of the Territory of Michigan, to the Detroit Young Men's Society, executed by Solomon Sibley, Geo. Morell and Ross Wilkins, as such Judges, and dated July 1, 1836 ; having first proved that the deed was executed by Sibley, Morell and Wilkins, on the day of its date, and that they were then reputed to be, and were in fact, acting as Judges of the territory of Michigan, and that John S. Horner was then reputed to be Governor of said

all other proceedings in the premises were regular according to the provisions of this title." (R. S. 98, § 20.) This provision of the Revised Statutes remained in force until the passage of the act of February 16, 1842, (S. L. 1842, p. 98, § 53,) which provided that the deed, thereby required to be executed by the County Treasurer, should " be *prima facie* evidence of title in the purchaser," &c. The act of March 6, 1843, (S. L. 1843, p. 58,) provides that the "deed shall be *prima facie* evidence of the correctness of all proceedings anterior to its execution".—*Reporter.*

territory, under the authority of the United States.   The plaintiffs in error objected to the reading of this deed in evidence, because, 1. At the time of its execution, the Governor and Judges of the *Territory* of Michigan, had no legal existence ; the territorial government and offices having been superseded and abolished, by the adoption of the state constitution, and the organization of a government, and the election and appointment of officers under it; 2. The Governor of the territory did not join with the Judges in the execution of the deed ; 3. The deed was not acknowledged ; 4. Parol evidence was inadmissible, to prove that the individuals who executed the deed, were Judges of the territory of Michigan.   All which objections were, by the Court, overruled, and the defendants in error permitted to read the deed in evidence.

The plaintiffs in error, having shown that they had been in possession of the premises in question since 1836, (Boland holding under Scott,) offered in evidence a deed from the Treasurer of Wayne county, dated October 10, 1833, conveying the premises to Scott, for the taxes assessed thereon for the year 1828.   The defendants in error objected, that this deed could not be read in evidence, until it was shown that the title of the premises had passed out of the United States, so that they were liable to be assessed for the taxes of the year 1828, and that such taxes had been regularly assessed and returned.   The Court sustained the objection, and rejected the evidence.

Having introduced proof to show that the premises were known as lot 52, prior to April 27, 1807, the plaintiffs in error offered in evidence, to prove an assignment thereof, a resolution of the Governor and Judges, adopted March 13, 1807, that said lot 52, be assigned to Elijah Brush, as agent for Todd and McGill ;—proof of the parol declarations of the Governor and Judges, made to the assessor of the city in the year 1828, that the lot in question, had

been conveyed, and was subject to taxation;—and also, proof that the records of the Governor and Judges, had been inaccurately kept, and that many grants had been made, and deeds given, which did not appear from those records. All which evidence was objected to by defendants in error, and rejected by the Court.

The records of the Secretary of State, were read in evidence on the trial, showing that a Legislature of the State of Michigan, was regularly organized, under the constitution of the state, November 3, 1835; and that Stevens T. Mason, having been duly elected and returned, on the same day, took the oath, and entered upon the duties of the office of Governor of the state.

It also appeared in evidence, that John S. Horner acted as Governor of the territory of Michigan, in July, 1835;— that he was the last acting Governor of the territory; and that he was reputed to have acted as such Governor, until some time in the year 1836;—that a session of the Supreme Court of the territory, was held by Geo. Morell and Ross Wilkins, Judges, in June, 1836;—and that Sibley, Morell and Wilkins, purported to act as Judges of the territory, on the first day of July, 1836.

The evidence being closed, the counsel for the plaintiffs in error requested the Court to charge the jury, specially, upon the points previously made, touching the validity of the act by which the defendants in error claimed to have been incorporated, and, also, of the deed under which they claimed title to the premises in question.

The Court refused to charge the jury as requested, but instructed them that the Detroit Young Men's Society was well incorporated, by the act of March 26, 1836; and that the deed, under which they claimed title, was properly executed, by persons having power to execute the same, and to convey the premises therein described.

To the several decisions of the Court, admitting or re-

jecting evidence offered by the parties; to the refusal of the Court to charge the jury as requested; and to the charge made by the Court, to the jury, the plaintiffs in error excepted.

The jury found a verdict for the defendants in error.

The counsel for the plaintiffs in error tendered a bill of exceptions, and removed the record into this Court by writ of error. The assignment of errors, and joinder therein, present the several questions raised at the trial.

*H. T. Backus,* for the plaintiffs in error.

1. Michigan was not a *State* but a *Territory* on the 26th day of March, 1836, and the Detroit Young Men's Society was never incorporated.

The right of the people of the Territory of Michigan to form a constitution and state government, secured by article fifth of the Ordinance of 1787, could not be exercised without the assent of Congress; and the state government could not go into operation until after admission into the Union. Congress had the right to determine, on such application for admission, whether the constitution and frame of government were republican, and in conformity to the principles of the Ordinance; and to refuse admission if they were not.

Michigan was not a state *of the Union* prior to her admission by Congress. She could not be a state *out of the Union,* for the Ordinance of 1787 expressly provides that the North-west territory, and states which may be formed therein, shall for ever remain a part of the confederacy of the United States, subject to the articles of confederation, and to such alterations therein as shall be constitutionally made, and to all ordinances of the United States in Congress assembled, conformable thereto.

2. If Michigan was a state prior to March 26, 1836, then the territorial government was superseded; there were no

Governor and Judges of the Territory on July 1, 1836, and the deed then executed, under which the plaintiffs below claim, was void. The act of Congress of April 21, 1806, evidently conferred the trust under which this deed was executed upon those who, from time to time, should legally exercise the functions of Governor and Judges of the Territory of Michigan. To the existence of such trustees three things were necessary. 1. The existence of the Territory. 2. Of such offices in the Territorial Government; and, 3. Officers duly appointed to fill them, and in the actual legal exercise of their official powers. But the Territory ceased to exist when the State was organized. There were no such offices in the Territorial Government, because there was no such Government.

Should it be contended that the offices and powers of the Governor and Judges were preserved by the Schedule to the constitution of Michigan, § 5, and that the persons holding such offices continued to hold them, and were competent to execute the trust above mentioned, until they were superseded by officers chosen under the state constitution, it may be replied, 1. That the Territorial Governor was superseded by the election and qualification of a Governor of the State November 3d, 1835; and, 2. That such offices were thereby made state offices, and the persons holding them state officers, deriving all their powers from the constitution and laws of the state.

3. As to the execution of the deed under which the defendants claim. To constitute a valid conveyance, it should have been executed by the Governor, as well as the Judges. The act of April 21, 1806, confers the powers under which it was executed. Sec. 1. empowers the Governor and Judges, *or any three of them*, to lay out a town, &c. But sec. 2. declares that the land, of which the premises in question are parcel, shall be *disposed of by the Governor and Judges aforesaid;* the qualification, " *or any three*

*of them,*" being omitted.    Words in a statute must receive their natural force and signification.    *Brown* v. *Barry,* 3 Dall. 366;  *United States* v. *Fisher,* 2 Cranch 358; · *Pennington* v. *Cox,* 2 *id.* 33;  *Wilkinson* v. *Leland,* 2 Pet. R. 662; 1 Brock. R. 162;  1 Kent's Com. 461, '2, '7.    The rule that the powers of trustees for public, and not private purposes, may be exercised by a majority of the trustees, does not apply here ; the *statute* making it necessary that the Governor should join.    *King* v. *Pasmore,* 3 T. R. 199; Kyd on Corp. 36;  *King* v. *Bellringer,* 4 T. R. 810;  *King* v. *Miller,* 6 T. R. 268;  *King* v. *Bullar,* 8 East. R. 389;  *King* v. *Williams,* 2 M. & S. 141;  *Polk's Lessee* v. *Wendell,* 5 Wheat. R. 293 ;  *Patterson* v. *Winn,* 11 Wheat. R. 388 ;  6 Pet. R. 691.

The deed should have been acknowledged.    The power given by the act is to "*make deeds to purchasers thereof;*" which must be construed to mean the instruments known and recognised by the law of the land as deeds.    When terms are used in a statute, which have a certain, technical, and legal definition, they must be taken in such sense in, construing the statute.    1 Kent's Com. 462;  *Elliott* v. *Swartwout,* 10 Pet. R. 137;  *United States* v. *Twenty-four Coils of Cordage,* 1 Bald. C. C. R. 505;  7 Cow. R. 702 ; 1 Bl. Com. 60 ;  2 M. & S. 230 ;  1 T. R. 728 ;  6 Mod. R. 143.    *Deed,* had a definite legal signification.    By the laws in force in Michigan it signified, *ex vi termini,* an instrument signed, sealed, witnessed, and acknowledged or proved.    Ordinance of 1787 ;  *McCartee* v. *Orphan Asylum,* 9 Cow. R. 437 ;  *Wilson* v. *Troup,* 2 Cow. R. 195.

*D. Goodwin* and *Geo. E. Hand,* for defendants in error.

*Hand* contended, 1. That under the Ordinance of 1787, Art. 5, the people of Michigan had an absolute right, when numbering 60,000 free inhabitants, to organize a state go-

vernment, and be admitted by delegates into Congress. The Constitution empowers Congress to *admit new states into the Union;* not to *create* them.   The new state must *exist,* it must have an organized government, before it can be admitted.   He referred to the various acts and historical events which resulted in the organization of the State Government.   The first Legislature which assembled under the new Constitution, at an adjourned session which commenced on the first Monday of February, 1836, enacted many important laws, providing in detail for the full establishment of the State Government in all its departments.   In fact, the whole fabric of our State Government rests upon the acts and doings of this Legislature.   The act to incorporate the Detroit Young Men's Society, was enacted by this Legislature, March 26, 1836.   On the same day the act was passed organizing the Supreme Court of the State of Michigan, defining its jurisdiction, and prescribing the number, qualifications and tenure of office of its Judges; from which act this Court derives its existence and its powers.   If, then, this Court has any legal existence, the Detroit Young Men's Society is well incorporated.

The United States have repeatedly recognized the validity of the acts of the people of Michigan in forming a Constitution and organizing a State Government.   They did so by admitting to their seats, although after some delay, a Representative and two Senators in Congress for the State, elected in the latter part of the year 1835; and who held their offices during their respective terms of office, commencing at the date of their election, and not of their admission to their seats.   Also, by " An act to establish the northern boundary line of the State of Ohio, and to provide for the admission of Michigan into the Union, upon the conditions therein expressed," approved June 15, 1836, (4 Story L. U. S. 2442,) in which it is enacted,

§ 2, that " the Constitution and State Government which the people *have formed* for themselves, be, and the same is hereby accepted, ratified and confirmed." The third, and also other sections of this act,—" An act to provide for the due execution of the laws of the United States within the state of Michigan," (§§ 1, 2, 3,) approved July 1, 1836, (4 Story's L. U. S. 2456,)—and also " An act to admit the state of Michigan into the Union upon an equal footing with the original States," approved January 26, 1837, (4 Story's L. U. S. 2531,)—all recognize the existence of the *State* of Michigan, although, at the date of their passage, she had not in fact been admitted into the Union by Congress.

2. As to the existence of the board of Governor and Judges on July 1, 1836, with authority to execute the trusts conferred by the act of April 21, 1806, (2 Story's L. U. S. 1025,) which authorized and empowered the Governor and Judges of the Territory of Michigan, to lay out a town on the site of the old town of Detroit and 10,000 acres adjacent, and to convey lots by donation and sale, he contended, 1. That this act was in the nature of a special commission, giving, to persons *designated*, merely by their titles of office, certain powers in relation to lands in Detroit, which had no connexion with their powers or duties as Governor or Judges under the territorial government; and that whoever held the commissions from the General Government, for the offices mentioned, might execute the trust conferred by the act, even though they had no executive or judicial functions to perform. 2. The fifth article of the Schedule annexed to the constitution of the state of Michigan, provided that all officers, holding their offices and appointments in the territory under the authority of the United States, should continue to hold and exercise their respective offices and appointments, until superseded under said constitution. The territorial judges

were not superseded until after the act organizing the Supreme Court (S. L. 1836, p. 30,) took effect, July 4, 1836. The deed to the Young Men's Society, dated July 1, 1836, was executed by persons recognized by the laws of the half organized state as territorial Judges, holding commissions under the United States. 3. Admitting that the state had been at this period fully organized, and the territorial government thereby abrogated and superseded within its limits, there was still a territory of Michigan beyond those limits, and extending from the west shore of Lake Michigan to the Rocky Mountains, over which John S. Horner was Governor, and the persons who executed the deed in question were Judges, with the same powers which they had formerly exercised within this Peninsula, as well as west of it; and with the power to execute the trust conferred upon them by the act of April 21, 1806. 4. The Territorial Judges retained and exercised judicial functions within the limits of the state, and independent of its government, as a *quasi* District and Circuit Court of the United States, until after July 1, 1836.

3. The deed to the Detroit Young Men's Society was properly executed. The just and rational construction of the act of April 21, 1806, is, that the Governor and Judges, *or any three of them*, had power to sell, as well as to donate lots. 2 Cranch R. 33, 385; Dwarris on Stat. 771, 704; 7 Barn. & Cress. 643; 10 Rep. 139. The power conferred by the act, being of a public nature, a majority could exercise it. *Grindley* v. *Barker*, 1 B. & P. 229, 236; *Attorney General* v. *Davy*, 2 Atk. R. 212; *Rex* v. *Beeston*, 3 T. R. 594; *Withnell* v. *Gartham*, 6 T. R. 398; Co. Lit. 181, *b; Downing* v. *Rugar*, 2 Wend. R. 178; Sudg. on Powers, 144, 211, 430; 8 Cow. R. 526; 6 John. R. 41; 11 Id. 169. It will be presumed that all were consulted, unless the contrary appear. 21 Wend. R. 184; 3 East. R. 192. All solemnities necessary to the

due execution of such a power will be presumed, unless the contrary, directly or indirectly, appears. Math. on Pres. Ev. 37, 40; *Knox* v. *Jenkins*, 7 Mass. R. 488; *Gray* v. *Gardiner*, 3 Mass. R. 399; 10 Mass. R. 105; 11 Id. 227. And in this case it will be presumed, if need be, that the Governor consulted with the Judges as to the sale and conveyance of the lot in question.

No acknowledgment of the deed was necessary. The act of Congress did not require it. Neither does the common law. Termes de la Ley, 149; 2 Coke, 225, 231, '2; 1 Shep. Touch. 54; 2 Rep. 5a; Cruise's Dig. 36; *Park* v. *Mears*, 2 B. & P. 217; *Long* v. *Rumsey*, 2 Serg. & Rawle R. 72; *Ingraham* v. *Hall*, 1 Hayw. R. 205; 6 Pet. R. 124; 1 Id. 245; 12 Id. 178. The word "*deed*" in the act, must receive its usual common law signification. *United States* v. *McGill*, 1 Wash. C. C. R. 463. Even under the territorial laws, (Laws 1833, p. 280,) a deed, neither acknowledged nor recorded, is good as against all except subsequent purchasers or creditors. 6 Pet. R. 124. The estate passed by force of the act of Congress, and not by any inherent virtue in the deed;—the persons executing it, merely nominating the party to take the estate. Sugd. on Pow. 1. Deeds, or patents from the United States, are never attested or acknowledged. The Governor and Judges stood in the place of the United States, and the deed, though not acknowledged, is clearly valid.

4. Parol proof of the official character of the Judges was sufficient. 2 Stark. Ev. 372; 4 T. R. 366; 2 C. & P. 217; 3 John. R. 431; 2 Serg. & Rawle, 440; 5 Barn. & Cress. 38; 4 Conn. R. 209.

5. The decision of the Court, refusing to admit the deed from the Treasurer of Wayne County to be read in evidence by the plaintiffs in error, was correct. *Williams* v. *Peyton*, 4 Wheat. R. 77; *Stead's Ex'rs.* v. *Course*, 4 Cranch R. 403; *McCheny* v. *Ross*, 5 Wheat. R. 116; *Thatcher* v.

*Powell,* 6 Wheat. R. 119; *Bush* v. *Williams,* 1 Cooke R. 360; *Wilcox* v. *Jackson,* 13 Pet. R. 498; *Bagnell* v. *Broderick,* 13 Pet. R. 436. So, also, were the other decisions of the Court, rejecting evidence offered by the plaintiffs, correct. The evidence offered was immaterial and irrelevant.

RANSOM, J. delivered the opinion of the Court.

This case presents two very important questions for our determination;—the first, involving the validity of the acts of our state government, and, in fact, the very existence of such government, prior to the admission of the state into the Union by Congress, January 26, 1837;—the second, involving the validity of the acts of the Governor and Judges of the Territory of Michigan, between the time of the organization of the government of the state, and her admission into the Union, while in the exercise of the powers conferred upon them by the "Act to provide for the adjustment of titles to land in the town of Detroit and Territory of Michigan, and for other purposes," approved April 21, 1806. The case also presents several other questions of minor importance, which will receive our consideration.

1. We shall first inquire whether Michigan was a *State,* with a constitution, and a government organized under it, possessing the sovereign power of state legislation, over the people within her limits, on the 26th day of March, 1836. If not, then the "Act to incorporate the Detroit Young Men's Society," passed by a body claiming to be the Legislature of such state, and approved by Stevens T. Mason as governor of such state, on the day last mentioned, was a nullity. It gave no vitality or powers to the defendants, as a corporation. They had no power to take and hold the real estate in question, or to sue for its recovery; and the Court below erred, in permitting the act to

be read in evidence to the jury, and in charging the jury, that the defendants were well incorporated under it.

The people of the former Territory of Michigan, remained subject to the territorial government established by Congress, until after they had acquired and exercised the right to organize a state government. That right was secured to them, on the happening of a certain future contingency, by the "Ordinance of Congress for the government of the Territory of the United States north-west of the River Ohio," passed July 13, 1787.

Article V. of the Ordinance, provides for the division of the territory north-west of the River Ohio into states; and also that, "whenever any of the said states shall have sixty thousand free inhabitants therein, such state shall be admitted, by its delegates, into the Congress of the United States, on an equal footing with the original states, in all respects whatever; and shall be at liberty to form a permanent constitution and state government." That the people of this division of the north-west territory, when it was found to contain sixty thousand free inhabitants, had a right to form a permanent constitution and state government, is unquestionable. The right, and the power to form such a constitution and government, was as absolutely and irrevocably vested in, and secured to, the inhabitants of Michigan, by the compact contained in the Ordinance of 1787, between the original states, and the people who then did, and who should thereafter inhabit the several divisions of the territory north-west of the River Ohio, as was the right of free government vested in and secured to, the whole people of the American Union, by the constitution of the United States. That right could in no way be modified or abridged, or its exercise controlled or restrained, by the general government, or by any other power whatever, unless it was done by the consent of the people themselves.

Although, in the wording of this article of the Ordinance, the "liberty to form a permanent constitution and state government," follows the grant of the right of such state, to "be admitted, by its delegates, into the Congress of the United States," yet, it is evident that the formation of the state must, of necessity, precede such admission. The state must exist, before it can have delegates.

To gain admission in fact into Congress, the new state must obtain the assent of that body,—not because she does not possess a positive and unqualified right, under the ordinance, to such admission, on an equal footing with the original states, with her boundaries as defined and agreed to in that instrument,—but, for the sole reason, that the older states represented in Congress, who are the other party to the compact, have the physical power to refuse a compliance with the terms of an agreement, which they have deliberately made; and there is no third party, to which the state, the weaker party, can resort to coerce a fulfilment of the agreement.

No such assent, however, was necessary, to enable the people to convene, at such time and place, and in such manner, as they might determine upon, and erect for themselves a frame of government. The only condition necessarily precedent to the formation of such government, was the existence of sixty thousand free inhabitants within the prescribed limits of the state.

In view of their rights, the people, through their representatives in the legislative council of 1834, adopted measures to take an enumeration of the inhabitants. The enumeration was made; and it demonstrated that Michigan contained a population of over eighty thousand free inhabitants, and was therefore entitled to form a constitution and state government. Provision was then made for a convention of the people. They assembled, by their delegates, in convention, on the second Monday of May,

1835. On the twenty-fourth day of June, of the same year, a constitution for the government of the state was ordained and established; and, in October following, it was fully ratified and confirmed by the people themselves. The constitution thus adopted, and the government which it established, were "republican, and in conformity to the principles contained in the ordinance" of 1787.

That Michigan contained the requisite number of free inhabitants to entitle her to a constitution and state government,—that the people proceeded regularly in the formation of such constitution and government,—and that they were republican, and in conformity to the principles of the Ordinance of 1787, is not questioned by the plaintiffs' counsel. It is still contended, however, that Michigan was not a state, until admitted into the Union, and recognized as such by Congress; but that she, in fact, remained subject to the territorial government prescribed by the laws of Congress, until her admission into the Union, and that all her pretended legislation, as a state, under the constitution she had adopted, was utterly null and void.

There is nothing to be found in the original compact, the Ordinance of 1787, which, in our judgment, favors this construction.

The people of the original states, at the termination of the revolutionary contest, found themselves overwhelmed with a debt, which they were unable to discharge. They were unwilling, and perhaps unable, to be taxed for its payment. For the purpose of providing the means to pay this debt, extensive tracts of land were ceded to the confederation, by Virginia and other states. These lands were an unreclaimed wilderness, peopled only by savages, and consequently unproductive and valueless to the treasury. To induce their settlement and sale, was, therefore, an object of the first importance to the states; and, to

effect this object, the terms of the compact contained in the Ordinance of 1787, were proposed. The confederation, in that act, in effect said, to those who should emigrate to either division of the north-west territory,—" If you will buy, reclaim, and settle our waste lands, and thus replenish our empty treasury, and, at the same time, protect our widely extended north-western frontier from the incursions of the Indians, we will provide for your government, until your number shall reach sixty thousand; and then, you shall be at liberty to form a state government for yourselves, and shall be admitted into our union of states, on an equal footing in all respects with ourselves."

To this compact, the people who settled in the, now, state of Michigan, became a party, and entitled to insist on the fulfilment of its terms by the general government. When, in 1834, therefore, it was ascertained that the event had transpired, on the happening of which, the right of the people of Michigan to form a constitution and state government, was to vest, they were at liberty, at any time, to avail themselves of that right. The general government no where provided in the compact, that the people should obtain their assent, before they proceeded to form such government. If the people had the power to form a permanent constitution and state government, it follows that they possessed the power to put the various departments of such government into operation.

If it be said that the constitution and government should have been first submitted to Congress, that it might be adjudged by that body whether they were republican and in conformity to the principles contained in the ordinance, it may be answered, that the confederation reserved to Congress, only the right to determine the character of the constitution, when, after its adoption by the people, application should be made for admission into the

Union.	If the state constitution so formed should be found to be repugnant, in any of its provisions, to the Ordinance of 1787, or to the constitution of the United States, or to the laws of the United States made in pursuance thereof, it would, so far forth, be utterly null and void, and be so adjudged by the appropriate tribunals, the courts of justice.

The constitution and government, formed by the people of Michigan, was, then, authorized by the Ordinance of 1787, and it was competent for the people to put such government in operation.

A legislature was duly organized in all its branches, and a governor elected, agreeably to the provisions of the constitution. The " act to incorporate the Detroit Young Men's Society," was passed by the legislature, and approved by the governor, according to the forms prescribed by the constitution. It was admissible in evidence on the trial, and it conferred upon the defendants, among other corporate franchises, the right to purchase, hold, and convey the real estate in question, and to sue for its recovery. There was, therefore, no error in the decision of the Court admitting this act to be read in evidence to the jury, or in the instruction of the Court to the jury that the defendants were well incorporated under it.

2. The next inquiry is, whether the Governor and Judges of the Territory of Michigan were *in esse*, and had power to execute a valid conveyance of the premises in question, on the first day of July, 1836,—the date of the execution of the deed from them to the defendants in error. If not, then the deed was void, and the defendants proved no title to the premises. The plaintiffs in error contend, that if the government of the state of Michigan was established prior to the execution of the deed, then the offices of Governor and Judges of the Territory were thereby abrogated, superseded and annulled.

We have before seen that the Territory north-west of the river Ohio, was organized by the Ordinance of 1787. The third clause of the first section, ordained that there should be appointed from time to time, by Congress, a governor, whose commission should continue in force three years, unless sooner revoked, and that *he should reside in the district.* The fourth clause of the same section, provided for the appointment of a court, to consist of three judges, who should have a common law jurisdiction, and *reside in the district,* and continue in commission during good behaviour.

The act of Congress of January 11, 1805, (Story's Laws U. S. 957,) organized the Territory of Michigan, and established for it a government, the same as that of the Indiana Territory, having like officers, with like powers and duties.

By the act of Congress of April 21, 1806, (2 Story's Laws U. S. 1025,) the Governor and Judges of the Territory, or *any three of them,* were authorized to lay out a town, including the old town of Detroit, and 10,000 acres adjacent, (except certain reservations;) and were required to hear, determine, and finally adjust, all claims to lots therein, and give deeds for the same. They were required to donate lots of certain dimensions, to persons whose houses had been burned in the old town of Detroit, June 11, 1805. It was further enacted by § 2, that, after satisfying claims provided for by the preceding section, the land remaining of the said 10,000 acres, should be disposed of by the *Governor and Judges aforesaid,* at their discretion, to the best advantage; and they were authorized to make deeds to purchasers thereof. They were further required to apply the proceeds of the land so disposed of, towards building a court house and jail in the town of Detroit.

This act originated the land board of the Governor and Judges, from whom have proceeded the titles to lands, (except the military reservations,) in the old town of De-

troit, and 10,000 acres adjacent. Under the authority conferred by it, the deed to the Detroit Young Men's Society, was executed.

Was John S. Horner Governor, and were Sibley, Morell, and Wilkins, Judges of the Territory of Michigan, with competent authority to execute this deed, on the day of its date, July 1, 1836 ?

It appears from the bill of exceptions, that it was proved by parol evidence on the trial, that Horner assumed, and was reputed, to be acting as Governor, and that Sibley, Morell and Wilkins, were reputed to be, and were, acting as Judges of the territory at that time.

An act of Congress, approved August 7, 1789, (1 Story's Laws U. S. 32,) provided, that in all cases, where, by the Ordinance of 1787, officers were required to be appointed by Congress, the President should nominate, and by and with the advice and consent of the Senate, appoint such officers, who should be commissioned by him; and that he should have the same power of renovation and removal, as, by the ordinance, was conferred upon Congress. The appointment of Governor, was for three years, as previously established. Under this act, Horner was appointed Secretary, and became the acting governor of the territory in 1835, and assumed to act as such governor, until after the execution of the deed in question. No evidence was offered to show his removal, or a revocation of his commission. He therefore continued in the office, legally exercising its functions, unless it was abolished by Congress, (which is not contended,) or unless its powers were superseded and abrogated, by the formation of a constitution and state government by the people of Michigan. Whether such was the effect of the formation of the state government, we shall by and by consider.

The Judges of the Territory of Michigan were, by the Ordinance of 1787, to hold their offices during good be-

haviour. An act of Congress approved March 3, 1823, (Story's Laws U. S. 1915) amongst other things, provides, " That the powers and duties of the Judges of said Territory," (Michigan,) " shall be regulated by such laws as are or may be in force therein; and the said Judges shall possess a chancery, as well as common law jurisdiction. The tenure of office of said Judges shall be limited to four years," &c., " provided, that nothing in this act contained shall be so construed as to deprive the Judges of the Territory, of the jurisdiction conferred upon them by the laws of the United States." The same act, § 7, provides that from and after June 1, 1823, " there shall be but one clerk of the Supreme Court of the Territory of Michigan, who shall perform all the duties of clerk of said Court, whether sitting as a *Circuit and District Court*, or as Judges of the *territorial* Court;" and the following section provides for the adjustment of the accounts of John J. Deming, for his services as clerk of said *District and Circuit* Court.

*District and Circuit* Court powers were expressly conferred on the Judges of the territories, by an act of Congress of March 3, 1805, (2 Story's Laws U· S. 975;) the first section of which enacts, "that the Superior Courts of the several territories of the United States, in which a District Court has not been established by law, shall, in all cases in which the United States are concerned, have and exercise, within their respective territories, the same jurisdiction and powers which are by law given to, or may be exercised by, the District Court of Kentucky district; and writs of error and appeals shall be from decisions therein to the Supreme Court," (of the United States,) " for the same causes, and under the same regulations, as from the said District Court of Kentucky district." The following section of the same act, provides a compensation for marshals, clerks, attorneys and jurors, ex-

tending, with some exceptions, to such officers of the territorial courts.

An act of Congress of February 19, 1831, (Gord. Dig. § 520,) goes still further, and provides, that the District Court of the United States, for the district of Michigan, (and also the District Courts of several other districts,) " in addition to the ordinary jurisdiction and powers of a District Court, shall, within the limits of their respective districts, have jurisdiction of all causes, except appeals and writs of error, which now are, or hereafter may, by law, be made cognizable in a Circuit Court, and shall proceed therein in the same manner as a Circuit Court."

I do not find that these several acts of Congress have been repealed. They were modified in some of their provisions, by the creation of distinct District and Circuit Courts, and the appointment of a District Judge, after the admission of Michigan into the Union, January 26, 1837. It follows, that until that time, the Judges of the Supreme Court of the Territory of Michigan, possessed, as Circuit and District Courts of the United States, the same jurisdiction and powers, in all respects, as the same Courts possessed, in any of the states; and their jurisdiction extended over the whole country then under the territorial government of Michigan, embracing Wisconsin, and a vast country west of it.

To enable the Judges to exercise their powers as District and Circuit Courts, all the usual officers of these tribunals were provided,—a district attorney, marshal, and collector of the revenue.

Under the authority of the act of Congress of March 3, 1823, before cited, (which, it will be recollected, authorized the territorial legislature of Michigan to regulate, by law, the powers and duties of the Judges of the Territory, providing, at the same time, that they should not have power to deprive said Judges of the jurisdiction con-

ferred upon them by the laws of the United States,) the legislative council, at different times, made numerous provisions regulating and modifying the judicial system of the territory, as was thought expedient. The Judges of the territory were, as a Court, denominated the *Supreme Court*, by an act of the territorial legislature, and not by an act of Congress. So the legislative council created a jurisdiction which was *entirely* local, styled the Superior Circuit Court, to be holden in the different counties of the territory, but by the same Judges appointed by the President. Indeed, they possessed under the act of Congress the most ample power to regulate all matters of purely local jurisprudence. There was a single limitation only, —that they should not interfere with the jurisdiction conferred upon the Judges by the laws of the United States.

The seventh section of an act of Congress of April 18, 1818, providing for the admission of the state of Illinois into the Union, (3 Story's Laws U. S. 1676,) was as follows: "All that part of the territory of the United States lying north of the state of Indiana, and which was included in the former Indiana Territory, together with that part of the Illinois Territory which is situated north of, and not included within, the boundaries prescribed by this act, to the state thereby authorized to be formed, shall be, and hereby is, attached to, and made a part of, the Michigan Territory, from and after the formation of the said state; subject, nevertheless, to be hereafter disposed of by Congress, according to the right reserved in the fifth article of the Ordinance aforesaid;" (the Ordinance of 1787,) "and the inhabitants therein shall be entitled to the same privileges and immunities, and subject to the same regulations, in all respects, with the other citizens of the Michigan Territory." The country thus attached to the Territory of Michigan, continued to form a part of it, until the Territorial Government of Wisconsin was con-

Scott *v.* Detroit Young Men's Society's Lossee.

stituted, by an act of Congress, approved April 20, 1836, which enacted, that, from and after the third day of July (then) next, all power and authority of the government of Michigan, in and over the Territory thereby constituted, should cease.    (4 Story's Laws U. S. 2426.)

I have thus referred to the Ordinance of 1787, and to the several acts of Congress, which created the offices of governor and judges of the territory of Michigan, prescribed the tenure and defined the powers and duties of each respectively, and the territorial boundaries within which such powers might be exercised ; and I have shown the general nature of the jurisdiction possessed by the Judges, both as a District and Circuit Court of the United States, and as a strictly local tribunal for the administration of the laws of the Territory.

Were the powers and duties of the Governor and Judges, such as we have seen them to be, under these various acts of Congress referred to, superseded by the organization of the State Government ?    And were these offices absolutely, and for all purposes, vacated and determined by that event ?

If determined, at what time ?    The change, from a Territorial to a State Government, was not, and from necessity could not be, instantaneous.    Indeed, our constitution itself contemplated that there could be no such sudden transition, for the fifth section of the Schedule, (of just as high authority as the constitution,) declares, that " all officers, civil and military, now holding their offices and appointments in this Territory, under the authority of the United States, or under the authority of this Territory, shall continue to hold and exercise their respective offices and appointments, until *superseded* under this constitution."    The act of the State Legislature providing for the appointment of Judges of the Supreme Court of the state, did not take effect, nor did such Judges enter

upon the term of their offices, until after July 4, 1836. The Judges of the Territory, therefore, continued to hold their offices, and to discharge the duties thereof, until after that time.

But, it may be said that they did so, under and by virtue of the State Constitution. Be it so. They were still within the precise meaning and intent of the fifth section of the Schedule ;—they were civil officers, holding their appointments under the authority of the United States. They had not been removed; their commissions had not been revoked by the President ; nor had their powers and duties been superseded, or taken away, by any legislation of Congress ; and the people of Michigan had declared, by their delegates in convention, that they should continue to hold and exercise those very offices and appointments, until superseded by state officers of corresponding powers and duties. There is certainly much plausibility in this view of the case, but I do not rest the decision of this point upon ground merely plausible.

We may admit, that, upon the formation of the state constitution and government, all the powers of the Governor of the Territory were superseded, and could no longer be exercised within the geographical boundaries of the newly organized state ; and we may admit further, that all the powers possessed and exercised by the Judges of the Territory, to which the *state* Judges, under the constitution and laws of the United States could succeed, were taken from the former and transferred to the latter functionaries:—were the offices of judges of the territory of Michigan, thereby terminated ? To my mind, clearly not. The jurisdiction of the Judges was abridged, but they nevertheless remained the Judges of the same district of country as before the change of government. They still possessed plenary jurisdiction, as Circuit and District Courts of the United States, over the country called the

Territory of Michigan, as appears from the positive en-
actments of Congress.   That Congress might confer those
powers upon *three,* instead of *one,* or *two* Judges, will not
be questioned.   Nor, will it be pretended, that any state
authorities could, in any way, interfere with those Courts,
so as either to enlarge, diminish, or take away their juris-
diction, or confer any of their powers upon state tribu-
nals.   Suppose the same Judges had been empowered
by Congress to exercise Circuit and District Court powers
*only?*   Would it have been contended by any one, that
the change from a territorial to a state government, could
have had the effect of determining their offices?   If such
would have been the effect of the change, under the cir-
cumstances supposed, upon the offices of Judges, it must
have had the like effect upon the offices of district attor-
ney, marshal, and collector of the revenue; and why not
upon the office of postmaster also?   The state government
had quite as much power to interfere with the transporta-
tion and delivery of the mails, and the collection of du-
ties on imports, as with the offices of circuit and dis-
trict judges, and the exercise of their powers and duties.
Again, suppose there had been one Judge of the Territory
of Michigan, instead of three Judges, and he had been
authorized to perform the duties of Circuit and District
Judge only.   Would the change of government have af-
fected the tenure of his office?   If not, does it vary the
case, that Congress deemed it expedient to associate three
persons to perform those duties.   It cannot be seriously
pretended.

   If it be said that Justices Morell, Sibley, and Wilkins,
were Judges of the Supreme Court of the Territory of
Michigan, and not Judges of a district or circuit federal
court, it may be answered, that the style of the court in
no way affects the question under consideration.   It was
in the power of Congress, to prescribe what style they

chose, for the inferior courts created by them. But, it is to be remembered, no law of Congress enacted that the Judges should be styled Judges of the Supreme Court. That style was given them by a law of the Territory. By the Ordinance of 1787, and the laws of Congress, they were styled Judges of the Territory of Michigan, simply.

It seems to me clear, that these three Judges had full power, at any time prior to the abolishment of their offices by express legislation of Congress, to take effect on our admission into the Union, to have tried and determined offences against the revenue laws, and postoffice laws, infringements of patent rights, and copy rights, or any other matters within the jurisdiction of the Circuit and District Courts of the United States. Suppose it had been provided by our state constitution, that the Circuit Court of the United States for this District should constitute the Supreme Court of this state, and that the Judge of the District Court should be the Chancellor; and suppose the Judges of these Federal Courts had consented to perform the duties of such State Judges and Chancellor; could it be said that the exercise of such jurisdiction would have vacated their offices, or in any way affected their powers and duties as Judges of the Circuit and District Courts of the United States? Certainly not. And if the conferring of local state jurisdiction and powers upon the Judges of these Federal Courts, could not have affected their jurisdiction and powers as federal judges, certainly, the circumstance that, by the organization of our state government, the jurisdiction which the Judges of the territory previously possessed, as a territorial and local court, was entirely superseded, could not have affected, in any way, the jurisdiction which they possessed as Circuit and District Courts.

But, if neither view which I have yet taken of this question be conclusive, there is still another aspect of it re-

maining to be examined, which, I think, must place it beyond all controversy. It will be kept in mind that, in 1818, the country west of Lake Michigan, now constituting the Territory of Wisconsin, was added to, and made a part of, the Territory of Michigan, and so remained until after the third day of July, 1836. Now, if it were true, that the organization of the state government had the effect to divest the Governor and Judges, and all other officers within this peninsula, holding their offices and appointments under the authority of the United States, of all official power and authority, within the boundaries of the state, and if their offices were in so far superseded by that event, would they not still retain their offices, with the same official powers and duties as before, in that portion of the Territory of Michigan, over which the state government did not extend? Was not John S. Horner Governor, and were not Sibley, Morell and Wilkins, Judges, of the *entire* Territory of Michigan,—as well that part of it which was west of Lake Michigan, and which remained subject to the territorial government until July 3, 1836, as that part which was east of the lake? Suppose these functionaries had all resided at Green Bay, or elsewhere west of Lake Michigan, at the time the state government went into operation; would it have been urged by any one, that their official existence was terminated by that event, or that it, in the slightest degree, affected their powers or jurisdiction, otherwise than by reducing the geographical limits within which they could be exercised? I apprehend not; and, in my judgment, the Judges would possess the same jurisdiction, over the same territory, as before, as Judges of the Circuit and District Courts of the United States; and they would only be deprived of their jurisdiction over mere matters of local jurisprudence within the limits of the state.

But, suppose the western part of the territory had been

erected into a state, instead of this peninsula.   Would it have been contended, that the formation of such state government would have dissolved and terminated the territorial government here?   Would it have occurred to any one that the offices of our Governor and Judges, and all others held under the General Government, were vacated and superseded by that event?   Unquestionably, never. Governor Horner, in such case, might rightfully have continued to perform the duties of Chief Executive officer of the Territory of Michigan, and Judges Sibley, Morell and Wilkins, to have exercised their judicial functions by holding courts, as before.

I am unable to see the slightest distinction between the case last supposed, and the one under consideration.   That the Governor and Judges usually resided at Detroit, instead of residing west of Lake Michigan, does not make any material distinction in the cases; because the Ordinance of 1787, which contains the only provision I have been able to find on the subject, simply declares, that they shall reside within their *district.*

That Congress entertained the view we have taken of this subject is certain ;  for, by the act organizing a government for the Territory of Wisconsin, it was provided, that the Governor and Secretary should, before they entered upon the discharge of the duties of their offices, each take an oath or affirmation, before some *Judge* or justice of the peace, of the *existing. Territory of Michigan;* and a subsequent section of the same act declared, that the *existing* laws of the Territory of Michigan should be extended over the newly created Territory.   This act was approved April 20, 1836 ; long after our state government was organized and in full operation.

From the foregoing considerations we are satisfied that John S. Horner was governor, and that the persons who executed the deed of the premises in controversy, were

Judges, of the Territory of Michigan, on the 1st day of July, 1836,—the day of the execution of the deed,—and that they had power to convey the premises.

3. But let us admit that this was not the case. Could the plaintiffs in error question the validity of the deed, on the ground that the grantors were not Judges of the territory, because their offices had been superseded by the organization of the state government. At the time of its execution, the United States held the unqualified fee of the lot conveyed, and possessed the absolute right to dispose of it, as they should deem expedient. They had empowered the Governor and Judges of the Territory, for the time being, to dispose of it, at their discretion, to the best advantage, by the act which we have before so often referred to. They appointed the persons who executed the deed, to those offices, and their terms of office were unexpired at the time of its execution; and we think that, by the acts of Congress before referred to, they recognized those persons as incumbents of those offices, and the existence of the offices, at and subsequent to the time of such execution. If so, the plaintiffs in error cannot now be permitted to deny that there were such offices, or that the grantors held them; for, surely, if the principal recognize and affirm the existence and acts of an agent, a mere stranger cannot be permitted to controvert either.

We shall now briefly consider several questions of minor importance, which were raised at the trial and relied upon in the argument of this case.

4. It is contended, that the deed to the Detroit Young Men's Society is void, because the Governor did not join with the Judges in executing it.

As a general proposition, it is undoubtedly true, that where several persons are appointed to execute a power or trust, and no authority is given to a less number than the whole to act, all must join in its execution. A distinc-

tion is drawn, however, between a mere private trust or power, and a power of a public nature, conferred by law, in the execution of which, it is contended, that a majority have a right to act. If all are present to deliberate, although a majority only assent to the act, it is unquestionably sufficient. *Grindley* v. *Barker*, 1 B. & P. 229, 236; *Rex* v. *Beeston*, 3 T. R. 594; *Withnell* v. *Gartham*, 6 T. R. 398; Co. Lit. 181, *b*; *Rex* v. *Windham*, Cowp. 377, '9. And, in this case, in the absence of proof to the contrary, it will be presumed that the Governor was present and consulted with the Judges, touching the grant and conveyance to the Detroit Young Men's Society, of the lot in question. Where an act of public duty is enjoined, and has been performed in fact, the law will presume, unless the contrary directly appears, that every thing necessary to give it validity was observed in the performance. *Downing* v. *Rugar*, 21 Wend. 184; Math. Pres. Ev. 40.

But it appears to me that the language of the act of Congress of April 21, 1806, (2 Story's Laws U. S. 1025,) is so explicit as to leave no room to question the validity of the deed, on the ground that it was not executed by the Governor. Section 1. authorized the Governor and Judges, &c., *or any three of them*, to lay out the town of Detroit, adjust claims to lots therein, and give deeds for the same. Section 2. provided that the land remaining, after satisfying certain claims provided for in the first section, should be disposed of by the Governor and Judges *aforesaid*, at their discretion, who were authorized to make deeds to purchasers, and to apply the proceeds towards building a courthouse, and jail, &c. Upon the ground of the difference observable between the phraseology of the first and second sections of the act, the former conferring powers upon the Governor and Judges, *or any three of them*, the latter upon the Governor and Judges *aforesaid*, the counsel for the plaintiffs in error, argued that there was a

distinction between the powers conferred by the two sections; and that the powers conferred by the second section could not be exercised, without the concurrence of the Governor and all of the Judges.   The word *aforesaid* is used relatively to what precedes it; and, being a collective word, may refer to several matters, according to the intent; it is sometimes very extensively applied.   Dwarris on St. 771; 10 Rep. 139.   Here, it manifestly refers to the persons described in the first section, just as they are there described; in other words, it is used to show that Congress intended, by the second section, to confer the *same* powers upon the *same* persons in the *sale* of lands, which the first section conferred in *donating* them.

It was also insisted that the Land Board created by this act consisted of two integral parts,—the Governor and Judges,—and that no valid act could be done by one part without the concurrence of the other.   We think this construction of the act cannot be sustained.   The Governor and Judges were four persons designated by their names of office, to perform the duties contemplated by the act; their powers were the same, and might be exercised in the same manner, as though the members of the board had been designated and appointed by their respective names. The act clearly excludes the construction contended for, if we are right in the view we have taken, that the same persons were authorized to act under the second section, as under the first.

5. Another objection taken was, that the deed of the Governor and Judges was inadmissible in evidence, because it was not acknowledged by the Judges who executed it.   A sufficient answer to this objection is, that, under the statute in force when the conveyance was made, (Laws 1832, p. 280,) a deed, though not acknowledged, was good as against every body except subsequent purchasers, or mortgagees, for a valuable consideration.   It

may be said further, that the word *deeds,* as used in the act conferring power upon the Governor and Judges "to make *deeds* to purchasers," must be understood in its common law signification. At common law, a deed is a written instrument under seal. This definition embraces the conveyance in question.

6. Again, it is objected that parol evidence was admitted, to prove the official character of the persons who executed the deed. It is insisted that their commissions, or the record of their appointment, should have been produced, or their absence accounted for, before parol proof could be received. Such is not the rule of evidence. The proof offered,—that they were reputed to be, and were acting Judges of the territory of Michigan,—was sufficient *prima facie.*

7. It is insisted also, that the Court below erred in refusing to permit the plaintiffs in error to read in evidence the deed from the Treasurer of Wayne County to Scott, executed October 10, 1833, in consummation of a sale of the lot in question, for the taxes of the year 1828. We have no doubt this deed was properly rejected. It was, at most, but evidence of the regularity of the Treasurer's *sale;* and unaccompanied by proof that the taxes, for which the sale was made and the deed given, had been legally assessed and returned, and that all the proceedings anterior to the sale, had been in conformity to the statute, it did not tend to prove a title to the premises in the plaintiffs in error, or to disprove the title of the defendants.

8. The Court below properly rejected, and excluded from the jury, the parol evidence introduced by the plaintiffs in error, to show that the premises in question were known as lot 52, prior to April 27, 1807; the resolution of the Governor and Judges offered in evidence to show an assignment of lot 52 to Elijah Brush as agent for Todd & McGill; the proof offered of the parol declarations of the

Scott *v.* Detroit Young Men's Society's Lessee.

Governor and Judges, made to the assessors of the city of Detroit, in the year 1828, that the lot in question had been conveyed and was subject to taxation ; and also the proof offered that the records of the Governor and Judges had been inaccurately kept, and that many grants had been made and deeds given which did not appear from those records.    This evidence was all wholly irrelevant and inadmissible.

The points of error raised upon the refusal of the Court below to instruct the jury as requested by the plaintiffs in error, and, also, upon the instruction given by the Court to the jury, have all been fully considered, in discussing the questions raised in the progress of the trial, as they appear in the bill of exceptions.

We are of opinion that there is no error in the record and proceedings of the Court below, in this case.    The judgment below must therefore be affirmed.

FELCH, J. did not participate in the decision, the cause having been argued before he took his seat upon the bench.

*Judgment affirmed.*